STATE HIGHWAY DEPARTMENT OF GEORGIA *et al.* v. MARKS *et al.*

No. 6674.   October 9, 1928.   Rehearing denied December 13, 1928.

*W. W. Abbott Jr., Pierce Brothers,* and *Seward M. Smith,* for plaintiffs in error.

*Hamilton Phinizy,* contra.

GILBERT, J. ■ The first question to be determined under the issues raised is whether the superior court of Jefferson County had jurisdiction of the case. The briefs of both parties contain strong arguments, and each cites a number of authorities. Both, however, assert that their position on the question of jurisdiction is upheld by the case of *Railroad Commission* v. *Palmer Hardware Co.,* 124 *Ga.* 633, 637, 648 (53 S. E. 193). That case was brought for the purpose of enjoining the Railroad Commission (now called the Public Service Commission) from putting into effect certain contemplated action. The Central of Georgia Railway Company was a party defendant. The suit was brought in Chatham superior court, and the jurisdiction of the court was brought in question. The opinion dealt entirely with the question of jurisdiction; and reference is here made to the elaborate and learned discussion there found. The court reviewed the decisions of this court and the

history of the constitutional provision as to jurisdiction, beginning with the English law. The court said: "The test for determining the venue of an equitable action in this State is not made to depend merely on the technical name given the parties defendant. . . The commission not being a body corporate, if the venue of a suit is to be fixed with reference to the commissioners, it follows, under the constitutional provision already quoted, that it would be in the county where one or more of the commissioners reside." The present petition alleges that one of the highway commissioners resides in Jefferson County. Therefore, under the principles ruled in the case just cited, we think that the superior court of that county had jurisdiction.

■ The next question for determination is whether, under the law and the facts, the State Highway Board has already adopted and taken into the system of State-aid roads as much or more than 6300 miles, the maximum mileage allowed under the present highway statutes. The first act of the legislature fixing the maximum number of miles made the limit 4800. Ga. L. 1919, p. 242. This was changed by an amendment, and the maximum was put at 5500 miles. Ga. L. 1921, p. 199. The second and last amendment fixed the limit at 6300 miles. Ga. L. 1925, p. 207. This is the present limit, unless there has been a change by implication because of the passage of some statute not dealing expressly with a limitation. It is insisted that the act of August 21, 1922 (Ga. Laws 1922, p. 176) permits the State Highway Board to extend the limit beyond 6300 miles. That entire act, omitting the caption and the enacting and repealing clauses, is as follows: "That provision 5, section 5, article 5 of Georgia Laws of 1919, and amendments thereto, Act 1921, to reorganize and reconstitute the State Highway Department of Georgia and to prescribe its powers and duties, be amended by adding at the end of said provision, section, and paragraph the following: Provided, said State Highway Board is authorized to construct and maintain State-aid roads in and through towns or cities of not more than twenty-five hundred people." It will be seen that the last-cited act makes no express mention of any limit of the number of miles that may be designated as State-aid roads. It merely purports to authorize the State Highway Board to construct and maintain State-aid roads in and through towns and cities of designated population. As we con-

strue the act, it had no effect whatever upon the limit of mileage. There is nothing to indicate that the General Assembly had in mind the subject of mileage limitation or exempting roads built within municipalities from the limitation already prescribed. Such subjects are not mentioned in the act, and there can be no exemption thereby implied. It necessarily follows, according to our view, that the limit expressly fixed by statute was not modified by implication. Moreover, there appears to be a satisfactory reason and explanation for the passage of the act of 1922. The controversy over the right of the State Highway Board and the county commissioners of Lee County to build a road through the Town of Smithville had already arisen. Indeed, the case between said board and the County of Lee, through its commissioners, and the Mayor and Council of Smithville was already in the courts, though it had not been finally determined by this court. We have no doubt that the General Assembly, at its 1922 session, being aware of the litigation, wisely decided to remove all doubt on the question in so far as it might affect other cases of like character, while in session, rather than await the outcome of the case pending in the Supreme Court or leave the existing doubt unsolved. The General Assembly realized, of course, that if the case should be decided in favor of the Town of Smithville, which sought to enjoin the Highway Board and county authorities, the hands of the road authorities would be tied until a subsequent session. The act of 1922 was approved on August 21, 1922, and the *Smithville* case was decided by this court on November 23, 1922. *Lee County* v. *Smithville,* 154 *Ga.* 550 (115 S. E. 107). It was, therefore, not definitely known at the time of the passage of said act whether the Highway Board and county had the legal right to build such highways through municipalities. The *Smithville* case settled the question by a full-bench decision in favor of such authority. The decision means that the State Highway Board and the county authorities already had the legal right to construct a State-aid road through municipalities. The 1922 act, therefore, conferred no additional authority in that respect. At the time of its passage the legal limit of State-aid roads was 5500 miles, and 6300 is the present limit. Finally, it will be noted that subsequently to the passage of the act of 1922 the General Assembly again fixed the limit at 6300 miles by the amending act of 1925. It has been the

unchanging policy of the General Assembly, from the first act creating the Highway Board, to expressly limit the mileage of State-aid roads. For these reasons, we are of the opinion that the court did not err in holding that the State Highway Board, under the facts of the case, had already adopted the full limit of mileage allowed under the law.

*Judgment affirmed. All the Justices concur.*

ON MOTION FOR REHEARING.

Plaintiffs in error moved for a rehearing. One of the grounds was that the court did not rule upon the contention made by movants that the so-called 7-mile stretch of road was a post-road, as referred to in the 1919 act. Ga. L. 1919, 242. One reason why the court did not deal with this question was, that, while the pleadings raised it, the question apparently was not insisted upon at the trial. When the chairman of the State Board was testifying a question was propounded to him which is indicated in his answer which follows: "As to how I justify myself and the board in constructing this seven-mile stretch when I know that the State Highway Department has gotten, and is maintaining more than 6300 miles, I would say we justify it in this way: We do not consider the mileage inside of towns a part of the specified mileage on the State-aid system; but we count this mileage inside of towns under the act of 1922, which provided that the State Highway Board was authorized to construct and maintain State-aid roads in towns of 2500 or less. Because at that time practically all the mileage provided for had been allocated; and it was our decision after having conferred with the attorney-general, that any mileage inside of towns of 2500 and less would not be counted as a part of the 5500 miles. Yes, my information as to the mileage up to May 5, 1927, is derived from others, the engineers of the various districts. I have no personal knowledge on the subject at all."

The act of 1919, with reference to post-roads, merely assents to the terms and provisions of the act of Congress, known as the "act to provide that the United States shall aid the States in the construction of rural post-roads," and "that the State Highway Department herein provided for shall discharge all of the duties arising under said act of Congress to be performed by a State Highway Department." The part of the act of Congress referred to is as follows: "That the Secretary of Agriculture is authorized to

co-operate with the States, through their respective State Highway Departments, in the construction of rural post-roads." The amendatory act of 1921 (Ga. L. 1921, p. 199) in no way changed the Georgia law as to post-roads. There is no provision of law authorizing the construction of rural post-roads as part of the system of State-aid roads, without considering such roads as coming within the limitation provided. To do otherwise would be to destroy the clearly expressed statutory policy of the General Assembly. It does not seem reasonable that the General Assembly intended to authorize the paving of post-roads without limit of mileage, where to do so would practically destroy all mileage limitation. Nearly all public roads are now post-roads.

The other grounds of the motion for rehearing are without merit, and hence are not specially referred to here.

*Motion for rehearing denied.*

On the motion for rehearing Beck, P. J., and Atkinson, J., dissent from the decision as originally rendered and as supplemented on the motion for rehearing.

Atkinson, J. ■ The State Highway Department is not a mere aggregate body of persons and as such suable at the residence of one or more of the individual persons composing the body, as was said of the Railroad Commission of Georgia in *Railroad Commission of Georgia* v. *Palmer Hardware Co.,* 124 *Ga.* 633, 647 (supra.) In the opinion in that case, after showing that the superior court of Chatham County did not have jurisdiction under the peculiar facts of the case, based on residence of the codefendant railroad company the principal office of which was in Chatham County, it was said: "If this equitable proceeding can not properly be brought in Chatham County, in what county should it be brought? It is urged by counsel for plaintiffs in error that it must be brought in Fulton County. This argument is based upon the Civil Code, § 2186, which, among other things, declares that ' the office of said commissioners shall be kept at Atlanta. ' It is argued that this creates an official residence or domicile where suit must be brought. All suits must be brought against some person, either natural or artificial. *Barbour* v. *Albany Lodge,* 73 *Ga.* 474; *Western and Atlantic R. Co.* v. *Dalton Marble Works,* 122 *Ga.* 774 [50 S. E. 978]. Only a person can be a party. In fixing the venue of a suit against the railroad commissioners of this State,

it must be determined whether the commission as a body is a corporation, and therefore an artificial person which can be made a party, or whether it is simply an aggregate body composed of the individual commissioners, and they are the parties to the action. The law of this State nowhere declares the commission as such to be a corporation, or to have power to sue or be sued in that name. On the contrary, it more frequently speaks of the commissioners than of the commission. See Civil Code, § 2185 et seq. In the two instances where provision is made for suit to be brought for a penalty incurred by a railroad company, it is expressly declared that it shall be brought in the name of the State. Civil Code, §§ 2195, 2196. A mere declaration that the office of the commissioners shall be kept at Atlanta does not create a corporation. The decision in the case of Texas and Pacific Ry. v. Interstate Commerce Com., 162 U. S. 197 [16 Sup. Ct. 666, 40 L. ed. 940], is relied on; but an examination of that case will show that the act of Congress creating the interstate-commerce commission, and providing that it shall be lawful for it to apply by petition to the circuit court sitting in equity, was held sufficient to create a body corporate with legal capacity to be a party plaintiff or defendant in the Federal courts. In this respect the act of Congress is entirely different from the act creating the State railroad commissioners. The commission not being a body corporate, if the venue of a suit is to be fixed with reference to the commissioners, it follows, under the constitutional provision already quoted, that it would be in the county where one or more of the commissioners reside."

It will be perceived that the court noted distinctions between the act creating the Railroad Commission of Georgia and the act of Congress creating the Interstate Commerce Commission, and in that way distinguished the case from Texas and Pacific Ry. v. Interstate Commerce Commission, supra, which held that "The Interstate Commerce Commission is a body corporate, with legal capacity to be a party plaintiff or defendant in the Federal courts." The act creating the State Highway Department of Georgia and its amendments confer, among others, the following powers which were not conferred upon the Railroad Commission of Georgia at the time of the rendition of that decision: (1) "The State Highway Department shall defend all suits and be responsible for all damages awarded against any county" upon causes of action originating

on highways jurisdiction over which shall have been assumed by the State Highway Department, when vouched in by the county to defend the suit, and "said State Highway Department" shall have the right and authority to adjust and settle, in the name of such county and on "its own behalf, any claim for damages for which said State Highway Department may be intimately [ultimately?] liable." Provision 5 of section 2 of article 5, Acts 1919, p. 242. (2) May exercise the right of eminent domain in order to acquire right of way for State-aid roads, and may acquire gravel pits, stone quarries, and the like, where necessary in the economic production of any material required in constructing and maintaining the system of State-aid roads. Sections 5 and 5(a) of the act of 1919, supra. (3) "Said Highway Department may sue and be sued or make settlement of all claims presented to it under oath." Acts 1925, p. 208. In addition to the foregoing there are other broad administrative powers relating to establishment, construction, and maintenance of the State's system of State-aid roads and other roads under the jurisdiction of the State Highway Department. From the foregoing it is apparent that the State Highway Department differs in character from the Railroad Commission of Georgia, and is a distinct entity and in substance a body corporate, as the Interstate Commerce Commission was held to be in the case of Texas and Pacific Ry. v. Interstate Commerce Com., supra. Upon similar reasoning the case is also distinguishable from *City of Hogansville* v. *Farrell Heating &c. Co.*, 161 *Ga.* 780 (132 S. E. 436), in which the board of education, the corporate character of which was in question, was not given by statute the power to sue and be sued, or the authority to exercise the power of eminent domain or to defend suits and become responsible for damages recovered by the suits. See generally, on the subject of corporate character of political bodies: 1 Dillon on Municipal Corporations (5th ed), 67 § 37; Farmer *v.* Myles, 106 La. 333 (30 So. 858); Shoshone Highway Dist. *v.* Anderson, 22 Idaho, 109 (3) (125 Pac. 219); Pennsylvania R. Co. *v.* United States Railroad Labor Board, 282 Fed. 693; Tyree *v.* Road Dist. No. 5 Navarro County (Tex. Civ. App.), 199 S. W. 644; State of Texas *v.* Interstate Commerce Commission etc., 258 U. S. 158 (42 Sup. Ct. 261, 66 L. ed. 531); 29 C. J. 567, § 286 (c); 14 C. J. 74, § 44 (c); 43 C. J. 72, §§ 9 et seq. The State Highway Department is not a

mere aggregate body such as that a suit against it would in law be a suit against the individuals composing the body, and consequently suable in the county of the residence of such individuals. The case under consideration, being distinguishable, as indicated, from *Railroad Commission* v. *Palmer Hardware Co.*, supra, is not controlled by the ruling therein made, but comes within the principle applied in Texas and Pacific Ry. *v.* Interstate Commerce Commission, supra. It follows that jurisdiction in this equity case in the superior court of Jefferson County can not be maintained on the ground that the State Highway Department was not a corporation but simply an aggregate body such as that a suit against it was in effect a suit against the individuals composing the body.

■ It was within the authority of the State Highway Department and its officials, with the aid of the Federal Government, to establish and construct the "seven-mile stretch" of road leading from highway route 24 via Hephzibah to the so-called Peach Orchard route designated as route 21. That road was not an "interconnecting county-seat" road. Two grounds of attack are made upon the establishment of that road: (a) because at the time of the resolution of the State Highway Department establishing that road as a State-aid road the State Highway Board had already taken over a greater number of miles of State-aid road than the statutes authorized; (b) because the State Highway Department had not completed the entire system of county-seat to county-seat roads throughout the State, and the taking over of said road was prohibited by the statute which provided that the State Highway Department should not take over any other road until the entire system of county-seat to county-seat roads had been completed. The act of Congress approved July 11, 1916, entitled: "An act to provide that the United States shall aid the States in the construction of rural post-roads, and for other purposes" (39 United States Statutes at Large, part 1, page 355), provides, in section 1: "That the Secretary of Agriculture is authorized to co-operate with the States, through their respective State Highway Departments, in the construction of rural post-roads; but no money apportioned under this act to any State shall be expended therein until its legislature shall have assented to the provisions of this act, except that, until the final adjournment of the first regular session of the legislature held after the passage of this act, the

assent of the Governor of the State shall be sufficient. The Secretary of Agriculture and the State Highway Department of each State shall agree upon the roads to be constructed therein and the character and method of construction; Provided, that all roads constructed under the provisions of this act shall be free from tolls of all kinds."

Section 2 of said act provides: "That for the purpose of this act the term 'rural post-road' shall be construed to mean any public road over which the United States mails now are or may hereafter be transported, excluding every street and road in a place having a population, as shown by the latest available Federal census, of two thousand five hundred or more, except that portion of any such street or road along which the houses average more than two hundred feet apart; the term 'State Highway Department' shall be construed to include any department of another name, or commission, or official or officials, of a State empowered, under its laws, to exercise the functions ordinarily exercised by a State Highway Department . . ." Section 6 of the act provides: "That any State desiring to avail itself of the benefits of this act shall, by its State Highway Department, submit to the Secretary of Agriculture project statements setting forth proposed construction of any rural post-road or roads therein. If the Secretary of Agriculture approve a project, the State Highway Department shall furnish to him such surveys, plans, specifications, and estimates therefor as he may require: . . If the Secretary of Agriculture approve the plans, specifications, and estimates, he shall notify the State Highway Department and immediately certify the fact to the Secretary of the Treasury. The Secretary of the Treasury shall thereupon set aside the share of the United States payable under this act on account of such project, which shall not exceed fifty per centum of the total estimated cost thereof. . . When the Secretary of Agriculture shall find that any project so approved by him has been constructed in compliance with said plans and specifications, he shall cause to be paid to the proper authority of said State the amount set aside for said project: . . The construction work and labor in each State shall be done in accordance with its laws, and under the direct supervision of the State Highway Department, subject to the inspection and approval of the Secretary of Agriculture and in accordance with the rules and regulations

made pursuant to this act. . . " Section 7 provides: "To maintain the roads constructed under the provisions of this act shall be the duty of the States, or their civil subdivisions, according to the laws of the several States. . . "

Shortly after the passage of the foregoing act of Congress, an act of the legislature of this State was approved on August 16, 1916 (Acts 1916, p. 125), the caption of which was as follows: "An act to designate the Prison Commission of Georgia, together with the State Geologist, the Dean of the College of Civil Engineering of the State University, and the Professor of Highway Engineering at the Georgia School of Technology, as the Highway Department of Georgia; to assent to the provisions of the act of Congress approved July 11, 1916, known as the ' act to provide that the United States shall aid the States in the construction of rural post-roads, and for other purposes, ' and for other purposes." The first section of this act provided for the creation of the State Highway Department of Georgia as indicated in the caption, and declared that said highway department "shall discharge all the duties prescribed by" the above-mentioned act of Congress "to be performed by such State Highway Department." Section 2 of said act of the legislature declares: "That the assent of the State of Georgia is hereby given to the terms and provisions of said act of Congress referred to in section 1." This act must be construed in connection with the act of Congress. It assents to the act of Congress, the provisions of which are made a part of the act of the legislature. Properly construed, this law authorizes the Highway Department of Georgia in its discretion, when agreed to by that body and the Federal authorities, to establish and construct rural post-roads, and only rural post-roads as defined in section 2 of the Federal act. This was a distinct class of roads. Roads of that class might be located anywhere in the State except in places having certain population as limited in section 2 of the act of Congress. There was no limit to the mileage of such roads that might be agreed upon and constructed by the State Highway Department and the Federal authorities. The location and extent of such roads was to be governed entirely by the proper discretion and agreement of the State Highway Department and the Federal authorities. Authority was expressly conferred upon the State Highway Department to do the several things prescribed in the act of Congress

and to establish, locate, and construct with the aid of Federal funds rural post-roads to be located as mentioned above. So if the act of the legislature of 1916 (Acts 1916, p. 125) had never been amended, there would be no question as to the authority of the State Highway Department to establish and construct, with Federal aid, the above-mentioned seven-mile stretch of road. The act of the legislature, however, was amended by an act approved August 18, 1919 (Acts 1919, p. 242). This act is composed of "articles" subdivided into "sections," which latter are in some instances divided into "paragraphs." Section 2 of article 5 is subdivided into "provisions."

It is declared in article 1: "That the State Highway Department of Georgia, created and provided for by the act approved August 16, 1916, is hereby reorganized and reconstituted as hereinafter provided, and said reorganized State Highway Department of Georgia shall at once succeed, without interruption, to the duties and powers of the predecessor, not in conflict with this act; and shall have full power and control in the performance and doing of all the things provided for in this act." Article 2 declares: "That the assent of the State of Georgia to the terms and provisions of the act of Congress approved July 11th, 1916, known as the ' act to provide that the United States shall aid the States in the construction of rural post-roads, and for other purposes,' is hereby continued; and that the State Highway Department herein provided for shall discharge all of the duties arising under said act of Congress to be performed by a State Highway Department, and is hereby constituted the proper agency of the State of Georgia to discharge all duties arising under any amendment or amendments to said act of Congress, or under other acts of Congress allotting Federal funds to be expended upon the public roads of this State." It is declared in section 1 of article 4: "That there is hereby created a system of State-aid roads in this State for the purpose of interconnecting the several county seats of the State, which shall be designated, constructed, improved, and maintained by the State under the State Highway Department, and the provisions of law; and that the term State-aid roads shall include the State or interstate bridges and other subsidiary structures necessary or desirable in the construction of said roads."

In section 1 of article 5 it is declared: "That the powers and

duties of the State Highway Department, . . shall be as follows: To have charge and control of all road or highway work designated or provided for, or done by the State or upon the State-aid roads; to designate, improve, supervise, construct, and maintain a system of State-aid roads; provided that no road shall become a part of said system until the same shall be so designated by the State Highway Board by written notice to the county road authorities concerned; to have the control, charge, supervision, and expenditures of all funds now or hereafter appropriated or provided for highway or road work by the State, or which may be a part of the State-aid road fund; to have power to provide for surveys, maps, specifications, and other things necessary in designating, supervising, locating, improving, constructing or maintaining said State-aid roads, or such other public roads as may be provided under this act; to secure consulting advisors in important technical matters, including the qualifications of technical employees; to employ clerical assistance and incur other expenses, including necessary equipment and office rent; to pay the compensation and expenses of all officials and employees of the State Highway Department; and to provide for such other expenses as may come under, or be in harmony with, the provisions of this act." In section 2 of article 5 it is declared: "That, immediately after the passage of this act, the Governor shall appoint the State Highway Board, who shall at once proceed to designate the system of interconnecting county-seat public roads to be known as State-aid roads, as comprised under the following provisions:" In provision 1 of section 2 of article 5 it is declared: "Two county-seat roads starting from the county seat shall be so designated in each county; said roads to traverse the county to the county line, and to connect with the designated State-aid roads of any adjoining county or counties." In provision 2 of section 2 of article 5 it is declared: "Additional main traffic roads may be designated which are necessary to complete the interconnecting system set forth in provision 1, where unusual topographic conditions are met with, or to serve important market points, where the county-seat to county-seat routes involve substantial loss of distances; provided, no such roads shall be built until the roads provided for in preceding paragraphs have been completed." In provision 3 of section 2 of article 5 it is declared: "In designating and locating the entire system of

State-aid roads, the effort shall be made to serve as large a territory and as many market points as practicable with the said system, due consideration being given to topographic and construction difficulties, and to secure main trunk line routes through the State; provided that the total mileage to be designated as State-aid roads shall not exceed (4,800) forty-eight hundred miles."

This act of 1919 was itself amended by an act approved August 10, 1921 (Acts 1921, p. 199). By section 1 of the latter act the words and figures "4,800 miles," as they appeared in provision 3 of section 2 of article 5 of the act of 1919, were stricken out, and the words and figures "5,500 miles" were substituted. In section 2 it was provided: "That until the construction of the said designated system of State-aid roads is completed all available funds from whatever source composing the State-aid road funds shall be used for the construction of and maintenance of said State-aid roads and be apportioned to the several counties on the basis of the road mileage as shown by the State system, and under the direction and supervision of the State Highway Department, and for the support of the said State Highway Department, or, in lieu thereof, to refund to or to reimburse counties which have actually constructed a similar road under the specifications and supervision of the State Highway Department as a part of said designated State-aid road system. . . Provided that nothing herein shall prevent the State Highway Department from using any of its funds to meet the necessary requirements of the Federal laws appropriating money for the purpose of constructing highways in Georgia." The act of 1921 was amended by the act approved August 21, 1925 (Acts 1925, p. 207), by striking from section 1 of the act of 1921 the figures and words "5,500 miles" and substituting therefor the figures and words "6,300 miles."

It will be perceived from the foregoing excerpts that the act of 1919 as amended provides for establishment by the State Highway Department of a "system of State-aid roads," which the statutes define in part by reference to location of roads to become parts of the system. For example, roads of this system are to be "interconnecting county-seat public roads." Two of them are required to start from the county-seat of each county and traverse the county to the county line and connect with the roads of said system in adjoining counties. And there may be "additional

main traffic roads" when necessary to complete the "interconnecting system . . where unusual topographic conditions are met with, or to serve important market points, where the county-seat to county-seat routes involve substantial loss of distances." But no such additional main traffic road shall be built until the interconnecting county-seat roads have been completed. The interconnecting county-seat roads shall be so located as to serve as large a territory and as many market points as practicable and to secure main trunk lines through the State, due consideration being given to topographic and construction difficulties. A public road that can not be located as an interconnecting county-seat road or a main traffic road under the conditions mentioned above can not be a part of the system of State-aid roads as established by the act of 1919. A rural post-road as contemplated by the act of 1916, and preserved by articles 1 and 2 of the act of 1919, might of course meet the foregoing requirements, in which event it would become a part of the said system of State-aid roads. But rural post-roads in remote rural districts not traversed by interconnecting county-seat roads or main traffic roads would not meet such requirements, and consequently would not form a part of the system of State-aid roads as defined by the act of 1919. There is no provision in the act of Congress limiting rural post-roads to "interconnecting county-seat roads" and "main traffic roads." Such a limitation would in part defeat the object of the Federal act, which was intended to facilitate transportation of mails in remote rural districts not touched by interconnecting county-seat roads or main traffic roads as well as in districts traversed by such roads.

Nor was it the purpose of the legislative act of 1919, which in articles 1 and 2 reaffirmed assent to the provisions of the act of Congress, to place any such limitation on rural post-roads. The State wanted Federal aid and authority to employ it just as broadly as was authorized by the act of Congress. So the act of 1919 recognized and retained the existing system of rural post-roads and created the "system of State-aid roads" defined as indicated above, thus giving two essentially different classes or systems of roads to which the authority of the State Highway Department was extended. Roads of the first class could be established and constructed only by agreement between the State Highway Department and the Federal authorities and with Federal aid, and located any-

where except in places having designated population as provided in section 2 of the act of Congress, while roads of the second class could be established and constructed in locations restricted to county-seat to county-seat roads and main traffic roads. as provided in the act of 1919. Such roads could be established and constructed with or without Federal aid, and in the latter instance without Federal agreement. The foregoing classifications are further emphasized by the language in section 1 of article 5 of the act of 1919, which confers authority upon the State Highway Department to have charge and control of "all road or highway work" provided for or "done by the State or upon the State-aid roads;" also to have power to provide for surveys, maps, specifications, etc., necessary in designating, constructing, or maintaining . "said State-aid roads, *or such other public roads as may be provided under this act.*" This language clearly contemplates State-aid roads and "other public roads." So also are the classifications further emphasized by the language in section 2 of the act of 1921, which, after directing that "State-aid road funds" shall be used for construction and maintenance of "said State-aid roads," etc., declares that "nothing herein shall prevent the State Highway Department from using any of its funds to meet the necessary requirements of the Feleral laws appropriating money for the purpose of constructing highways in Georgia," referring necessarily to rural post-roads, they being the only roads on which Federal funds could be employed.

Relatively to the said system of State-aid roads, the act of 1919, as amended by the acts of 1921 and 1925, imposes a mileage limitation. This limitation, as expressed in provision 3 of section 2 of article 5 of the act of 1919, relates expressly to "State-aid roads," and does not apply to rural post-roads that were not interconnecting county-seat roads or main traffic roads and as such made parts of the class designated as the system of "State-aid roads." So under the powers relating to rural post-roads it was within the authority conferred upon the State Highway Department, acting by agreement with the Federal authorities and receiving Federal aid, to establish and construct such roads as the "seven-mile stretch" which was not an interconnecting county-seat road or a main traffic road necessary to complete the system of interconnecting county-seat roads; and it was not a good ground of

attack, that, before establishment of the road in question, the State Highway Department had exceeded the mileage limit of roads authorized to be included in the "system of State-aid roads," or that the State Highway Department had not completed the entire system of county-seat to county-seat roads. The resolution of the State Highway Department declared that the seven-mile stretch of road should be added to the "State-aid system of Georgia." This, of course, could not be done, because the road was not so located as that it could be a part of that system; but that defect in the resolution does not extend to the authority of the State Highway Deparment to establish and construct the road as a rural post-road, not forming a part of the system of State-aid roads. As indicated at the beginning of this division of this opinion, no attack was made upon this seven-mile stretch of road on the ground that it was not in fact a rural post-road.

Mr. Presiding Justice Beck concurs in the views expressed in the foregoing dissenting opinion.